IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| PAULA RENEE HOOD, | ) | Case No. 1:17-cv-02037 |
| | ) | |
| Plaintiff, | ) | |
| | ) | MAGISTRATE JUDGE |
| v. | ) | THOMAS M. PARKER |
| | ) | |
| COMMISSIONER OF SOCIAL SECURITY, | ) | |
| | ) | **MEMORANDUM OF OPINION** |
| Defendant. | ) | **AND ORDER** |
| | ) | |

## I.    Introduction

Plaintiff, Paula Renee Hood, seeks judicial review, pursuant to 42 U.S.C. §405(g), 42

U.S.C. §1383(c)(3), of the final decision of the Commissioner of Social Security

("commissioner") denying her application for Supplemental Security Income ("SSI") under Title

XVI of the Social Security Act ("Act").  The parties have consented to my jurisdiction.  ECF

Doc. 13.

Because the ALJ properly evaluated the opinion of the state agency examining

consultant, and because the commissioner's decision was supported by substantial evidence it

must be AFFIRMED.

## II. Procedural History

Hood applied for SSI on July 31, 2014 (Tr. 139) alleging a disability onset date in 1997.[1]
(*Id.*)  Hood alleged disability due to conditions of back problems, "legs going numb," hbp,
stomach problems, and ulcer.  (Tr. 67)  Hood's application was denied initially on December 5,
2014, and on reconsideration on May 5, 2015.[2]  (Tr. 10, 65-74)  Thereafter, Hood filed a written
request for rehearing on June 15, 2016.  (*Id.*)  Administrative Law Judge ("ALJ") Joseph G.
Hajjar heard the case on May 6, 2015 (Tr. 15), and denied Hood's claim on August 30, 2016.
(Tr. 7)  The Appeals Council denied further review on July 26, 2017, rendering the ALJ's
decision the final decision of the Commissioner.  (Tr. 1)

## III. Evidence

Hood now raises one argument: that the ALJ failed to properly consider the medical
opinion of state agency consultative examiner, J. Joseph Konieczny, Ph.D.  *See* ECF Doc. 17,
Page ID# 1342.  Because the issue is limited, it is unnecessary to summarize the entire record.

### A. Personal, Educational, and Vocational Evidence

Hood was 44 years old on her amended onset date, and had turned 46 by the time of the
hearing.  (Tr. 48, 139)  Hood quit school in the ninth grade and did not obtain a G.E.D.  (Tr. 51)
The ALJ found Hood had no past relevant work.  (*Id.*)

### B. Medical Records Related to Hood's Mental Health Condition

Hood alleged disability due to her back and leg problems, hbp, stomach problems, ulcer,
depression, and cancer in her left kidney.  (Tr. 63, 208)  Because Hood's argument on appeal

---

[1] Hood later amended her onset date to July 31, 2014, the date of her SSI application, by a filing dated
June 15, 2016.  (Tr. 157)

[2] The ALJ decision indicates the initial denial occurred before Hood applied for benefits, on May 1, 2014;
however, the record indicates the initial determination was made on December 5, 2015.

only concerns the ALJ's handling of the opinions of a psychological consultative examiner's opinions, the court will only discuss evidence relating to her mental health condition.

On September 12, 2014, Hood saw Lee Ponsky, M.D. regarding a left renal mass. (Tr. 633) Hood reported she had depression, but no anxiety, and was not suicidal. (Tr. 634) On October 21, 2014, Hood saw Dr. Ponsky for a follow up from her nephrectomy surgery. (Tr. 626) Hood reported no depression or anxiety and was not suicidal. (Tr. 627) On examination, Hood's mood and affect were normal and she was oriented to person, place, and time. (Tr. 628)

On November 6, 2014, Hood saw Robert A. Diwgosh, M.D. to re-establish primary care. (Tr. 692) Hood reported that she "did not have any chem or radiation with this cancer and she [wa]s concerned it may come back because her father died from the same type of kidney cancer . . ." and she was "dealing with this and then also the loss of her husband." (Tr. 692) He found Hood was very tearful. (Tr. 692-93) He noted Hood was despondent because she lost her husband in June and then diagnosed with renal cancer. (Tr. 692) At follow up appointments on November 13, 2014, December 4, 2014, and January 5, 2015, Hood did not report any depression, and Dr. Diwgosh found Hood's mood and affect were broad and appropriate. (Tr. 676, 687, 689)

On January 14, 2015, Hood complained to Preetha Muthusamy, M.D. of left facial numbness. (Tr. 669) Hood reported no depression or anxiety, and Dr. Muthusamy found Hood's mental status was normal. (Tr. 671)

On February 6, 2015, saw Dr. Diwgosh and did not report anxiety or depression; and, on examination, her mood and affect were broad and appropriate. (Tr. 741)

On March 17, 2015, Hood saw Dr. Muthusamy about the numbness in her face. (Tr. 901) Hood did not report depression or anxiety and Dr. Muthusamy found Hood's mental status was normal. (Tr. 904)

On May 14, 2015, Terese Cybulski, LISW prepared a clinical narrative regarding Hoods' mental condition. (Tr. 825) Hood reported that she'd been depressed since her husband's death, was thinking of suicide, had twice been denied for Social Security, and had many financial problems. (Tr. 825) She reported symptoms, including sleep disturbances, mood changes, fatigue, restlessness, change in appetite, difficulty concentrating, and feelings of guilt and hopelessness. (Tr. 825) She said being in pain, having no money, losing her kidney, life situations, and being around people all caused her stress. (*Id.*) Hood reported having a close relationship with her four daughters and all of her grandchildren. (Tr. 826) She reported having no friends and not being involved in the community or volunteer activities. (*Id.*) She said she liked to play games, spend time on her computer with Facebook, and do crafts. (*Id.*) She reported she did not want to work. (Tr. 828) She reported severe anxiety due to her situation and that she isolated herself at home, because she could not be in crowds. (Tr. 830) Ms. Cybulski found Hood's demeanor was average, she was suicidal and depressed, and had impaired memory, but she was cooperative. (Tr. 831-32)

On May 20, 2015, Hood reported to Dr. Diwgosh that she was very depressed, had tried to overdose, was seeing community counseling, and got denied for disability and was unable to work because of the pain. (Tr. 888) She reported that she told her family she intended to kill herself, and her family hid her pills and her car keys. (*Id.*) Dr. Diwgosh noted that Hood seemed despondent over being rejected for disability. (*Id.*) On examination, Hood was withdrawn and tearful. (Tr. 889) Hood agreed to do an acute psychological evaluation in the emergency room

and to "psych admission" if needed, and staff escorted her to the ER.  (*Id.*)  Imraan Haniff, M.D. evaluated Hood in the ER.  (Tr. 988)  Hood reported that her depression was a new problem that started a week prior to the date of the evaluation.  (Tr. 988)  She reported her depression was gradually worsening and her symptoms were aggravated by drinking and stress.  (*Id.*)  Hood reported she had tried nothing for the symptoms.  (*Id.*)  She reported symptoms including, depression, suicidal ideas, confusion, sleep disturbance, and self-injury and that she was nervous and anxious.  (Tr. 989)  On examination, Hood's affect was blunt, her speech was delayed, she was slowed, and her cognition and memory were impaired.  (*Id.*)  Hood was admitted to the ER. (Tr. 990)

On May 21, 2015, Hood had recreational therapy with therapist Jean M. Fisher.  (Tr. 957) Hood's mood and affect were appropriate.  (*Id.*)  That same date Daniel B. Keaton, M.D. performed a psychological evaluation.  (*Id.*)  He noted Hood had multiple biophychosocial stressors in her life, including the death of her husband, diagnosis of renal cell carcinoma, and father's death from renal carcinoma.  (Tr. 958)  She reported symptoms of depression, loss of interest, feelings of hopelessness, helplessness, worthlessness, sleep and appetite disturbances, suicidal ideations, poor concentration, and indecision.  (Tr. 958)  Hood stated she was not sure that Lexapro was helping her.  (*Id.*)  She reported that she had filed for disability and had been denied the past week.  (*Id.*)  Dr. Keaton noted Hood had situational anxiety.  (Tr. 958)  Dr. Keaton increased Lexapro and added Abilify.  (*Id.*)  He diagnosed her with major depression, severe, recurrent, without psychosis, and anxiety and assigned her a GAF score of 30.  (Tr. 959)

Hood was discharged from the hospital on May 22, 2015.  (Tr. 961)  She reported feeling "good" and that her mood was "great." (Tr. 962)  She denied any symptoms of depression, anxiety, or suicidal or homicidal ideations.  (*Id.*)

On June 22, 2015, Hood saw Premal Patwa, M.D. about her complaint of "feeling down." (Tr. 821)  Hood reported feeling severely hopeless, helpless, difficulty sleeping, and loss of appetite and weight loss.  (*Id.*)  She reported some benefit from her medications, Lexapro, Abilify, and trazodone, but that her mood was still "down".  (Tr. 821)  Dr. Patwa found Hood was alert with good eye contact and normal speech.  (Tr. 822)  Hood's mood and affect were down, her thought process was linear and goal directed, and her insight and judgment seemed fair.  (*Id.*)  Dr. Patwa continued Lexapro, Abilify, and trazodone.  (*Id.*)  She gave Hood a GAF score of 45-50.  (*Id.*)

On July 10, 2015, Hood complained to Patrick K. Gray, D.O. of lower back pain.  (Tr. 950)  She reported no psychiatric problems, and, on examination, she had normal mood and affect.  (Tr. 951)

On August 17, 2015, Hood was noted to have been compliant with her medications and reported that she was "doing fine" and had noticed benefit from her medications and counseling. (Tr. 819)  She reported that she felt down at times but was able to come out of it.  (*Id.*)  On examination, Hood's mood and affect were down and her insight and judgment seemed to be fair.  (*Id.*)  Dr. Patwa continued Hood's medications and advised her to continue counseling.  (Tr. 820)

On October 12, 2015, Hood reported feeling down and having more anxiety and nervousness due to investigations regarding potential kidney cancer relapse.  (Tr. 816)  She reported feeling somewhat hopeless.  (*Id.*)  Patwa continued Hood's medications and advised her to continue counseling.  (Tr. 817)

On November 6, 2015, Hood went to the ER due to an allergic reaction in her face. (Tr. 1107) Hood reported no psychiatric or behavioral problems and Dr. Haniff found she had normal mood and affect. (Tr. 1109)

On November 9, 2015, Hood reported to Dr. Patwa that she was somewhat better and that an increase in the dosage of Abilify caused some improvement. (Tr. 1037) Dr. Patwa found Hood's affect and mood seemed to be down and her insight and judgment were fair. (*Id.*) Dr. Patwa continued her medications. (Tr. 1038)

On December 8, 2015, Hood had a follow up appointment regarding her left facial numbness and migraines. (Tr. 1240) She reported no depression or anxiety, and, on examination, her mental status was normal. (Tr. 1242-43) That same day, in an appointment regarding her back condition, Hood reported depression, memory loss, and anxiety, but was found to be calm and relaxed upon examination. (Tr. 1234)

On January 6, 2016, Hood reported that she was feeling down and depressed because her father-in-law had passed away. (Tr. 1035) She reported anxiety about getting an epidural injection. (*Id.*) Dr. Patwa continued Hood's medications and advised her to continue counselling. (Tr. 1036)

On January 11, 2016, Hood saw John W. Hill for pain management. (Tr. 1102-03) She reported depression, memory loss, and anxiety, Dr. Hill found she was calm and relaxed on examination. (Tr. 1104)

On January 26, 2016, Hood complained to Dr. Diwgosh of numbness and tingling in her arms and knee pain. (Tr. 1220) She did not complain of depression or anxiety, and Dr. Diwgosh found her mood and affect were broad and appropriate. (Tr. 1222)

On February 3, 2016, Hood reported feeling down, depression, and crying episodes. (Tr. 1033) Dr. Patwa increased Abilify and continued the other medications. (Tr. 1034)

On February 23, 2016, Hood reported to Dr. Hill that she was unable to work and had applied for disability benefits. (Tr. 1211) Dr. Hill assessed that Hood was calm and relaxed and displayed no symptoms of depression, anxiety, or suicidal ideations; and Hood did not report any such symptoms. (Tr. 1213)

On February 25, 2016, Hood saw Dr. Diwgosh regarding her claims of sore throat, nasal congestion, chest congestion, and back pain. (Tr. 1206) She did not report depression or anxiety and, on examination, Dr. Diwgosh found Hood's mood and affect were broad and appropriate. (Tr. 1208)

On March 7, 2016, Hood saw Amar Mutnal, M.D. for a consultation on her hand numbness. (Tr. 1198) She reported no sleep disturbance, mood disorder, or recent psychological stressors, and on examination, Dr. Mutnal found her mood and affect were appropriate and she was alert and oriented "x3." (Tr. 1200-01)

On March 10 and 14, 2016, Hood saw Dr. Diwgosh in preparation for carpal tunnel surgery. (Tr. 1091, 1186) On March 10, 2016, she reported having anxiety and depression, and, on examination, Dr. Diwgosh found she was alert, in no distress, and cooperative, with a flattened affect. (Tr. 1094) On March 14, 2016, she reported no sleep disturbance, mood disorder, or recent psychosocial stressors, and on examination, Dr. Diwgosh found her mood and affect were broad and appropriate. (Tr. 1187)

On March 28, 2016, Hood complained of left face numbness to Dr. Muthusamy. (Tr. 1174) Hood did not report depression or anxiety; and, on examination, Dr. Muthusamy found Hood's mental status was normal. (Tr. 1177)

On March 29, 2016, Hood reported feeling down and depressed and having crying episodes. (Tr. 1031) She reported that her daughter had been diagnosed with an untreatable liver condition; and she said it was possible she had cervical cancer. (*Id.*) Dr. Patwa continued Hood's medication and advised her to continue with counselling. (Tr. 1032)

On April 8, 2016, Hood sought treatment for discoloration, pain, swelling, and warmth at her left wrist carpal tunnel incision site. (Tr. 1159) Hood did not report having anxiety or depression. (1161)

### C.  Opinion Evidence

#### 1.  J. Joseph Konieczny, Ph.D. – State Agency Consultative Examiner

On February 27, 2015, J. Joseph Konieczny, Ph.D. performed a psychological evaluation regarding Hood's depression. (Tr. 794) Hood reported that she had never been hospitalized for psychiatric reasons and had never participated in outpatient psychiatric or psychological treatment services. (Tr. 794) Hood reported a history of depression since the death of her father in 2008. (*Id.*) She reported her depression had been severe over the past year. (*Id.*) She was tearful at the interview and indicated she experienced daily episodes of crying. (Tr. 794-95) She reported she attempted suicide by overdosing, but required no medical intervention and had no psychiatric follow-up. (Tr. 795) She said she always felt people were staring at her. (*Id.*)

On examination, Dr. Konieczny found Hood's grooming and hygiene appeared adequate. (*Id.*) She was cooperative and showed no indications of undue impulsivity and denied experiencing difficulties in controlling her temper. (*Id.*) She reported having mood swings. (*Id.*) Dr. Konieczny found Hood's level of motivation and participation were adequate, although Hood described her overall level of motivation as diminished. (*Id.*) Dr. Konieczny found Hood was capable of expressing herself in a clear and coherent manner. (*Id.*) Hood reported difficulty

sleeping, and diminished appetite and energy. (*Id.*) She reported concerns with her health and medical issues. (*Id.*) Dr. Konieczny noted mild impairment in Hood's ability to concentrate and attend to tasks because she made at least one error when performing a serial three subtraction task and her responses were slow. (*Id.*) He found Hood showed no deficits in her awareness of rules of social judgment and conformity and mild deficits in her overall level of judgment. (Tr. 796) He found Hood appeared capable of managing her own daily activities and financial affairs without assistance. (*Id.*) He found her overall level of functioning was at a reduced level of efficiency, reflective of her mood symptoms and perceived physical limitations. (*Id.*) He noted Hood participated minimally in routine driving tasks, cooking, cleaning, laundry, and household tasks in her home to the extent she perceived she was physically capable and performed her own shopping tasks and managed her own finances. (*Id.*) Dr. Konieczny diagnosed Hood with major depressive disorder, recurrent, severe, with anxious distress. (*Id.*) He found that her reports were a reliable reflection of her situation. (*Id.*)

Dr. Konieczny opined Hood would have mild to moderate limitation in her ability to understand, remember, and carry out instructions as a result of her severe depression. (Tr. 796) He opined Hood would have difficulty maintaining focus and persistence in moderate to complex multi-step tasks as a result of her depressive symptoms. (*Id.*) He opined Hood would have significantly diminished tolerance for frustration and diminished coping skills which would impact her abilities to respond to typical supervision and interpersonal situations and even simple pressure situation in the work setting. (*Id.*)

### 2. Bonnie Katz, Ph.D. – State Agency Reviewing Psychologist

On March 21, 2015, state agency psychologist, Bonnie Katz, Ph.D. assessed Hood's mental RFC. (Tr. 88-90) She opined Hood was not significantly limited in her abilities to

remember locations and work-like procedures or understand and remember very short and simple instructions, but was moderately limited in her ability to understand and remember detailed instructions. (Tr. 89) Dr. Katz opined Hood was not significantly limited in her ability to carry out very short and simple instructions, perform activities without a schedule, maintain regular attendance, sustain an ordinary routine without special supervision, work in coordination with or in proximity to others without distraction, make simple work-related decisions, or complete a normal workday and workweek without interruptions from psychologically based symptoms, and to perform at a consistent pace. (*Id.*) She opined Hood was moderately limited in her abilities to carry out detailed instructions and maintain attention and concentration for extended periods. (*Id.*) Dr. Katz opined Hood was not significantly limited in her abilities to interact appropriately with the general public, ask simple questions or request assistance, get along with co-workers or peers, and maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness. (Tr. 90) She opined Hood was moderately limited in her ability to accept instructions and respond appropriately to criticism from supervisors. (*Id.*) Dr. Katz noted Hood was able to interact on an occasional, superficial basis. (*Id.*) She opined Hood was moderately limited in her ability to respond appropriately to changes in the work setting, but not significantly limited in her abilities to be aware of normal hazards and take appropriate precautions, travel in unfamiliar places or use public transportation, or set realistic goals or make plans independently of others. (*Id.*) She opined that Hood would be able to adapt in a low stress/static environment where changes are infrequent and can be explained fully. (*Id.*)

### D. Testimonial Evidence

#### 1.      Claimant's Testimony

At the June 15, 2016 hearing, Hood testified, in relevant part, that she lived with her mother, brother, and adult niece. (Tr. 49) Hood testified that she could not work due to her back, medications, and her depression. (Tr. 52-53) She stated her depression interfered with her ability to work because it made her not want to be around people and made her no longer want to be on Earth. (Tr. 53).

She stated she had four daughters and seven grandchildren. (Tr. 54) She stated she tried to spend time with them, and go to their cookouts or have dinner. (*Id.*) She babysat her grandchildren "a couple times," and had taken care of children that were nine, eight, and six years old. (*Id.*)

Hood stated on a typical day she would get up and take her medicine, use the restroom, sometimes shower, make something to eat, then lay on the bed or go downstairs or outside to do things with her kids. (Tr. 54-55) She also helped out around the house by washing dishes, sweeping the floor, and vacuuming. (Tr. 55) She stated she did not belong to any social groups or churches. (Tr. 56) Two years before the hearing she stopped doing her hobbies, sewing and various crafts, because she could no longer concentrate due to pain and numbness. (Tr. 56, 59) When she would go out with her kids, she usually went to her backyard or the park and watched them play. (Tr. 56) She said she would not stay long at the park if there were a lot of people there because she felt like people stared at and judged her. (Tr. 57) She said she usually did not go anywhere by herself and would only go to the park at her kids request. (*Id.*) She stated she went grocery shopping and used a wheelchair to move around, but would want to leave because she felt like everyone was looking at her. (Tr. 58)

She stated she took her depression medication, but her doctor repeatedly increased the dosage. (Tr. 58) She said she also went to counseling. (Tr. 59)

## 2. Vocational Expert Testimony

Vocational expert ("VE") Kathleen Reis also testified at the May June 15, 2016 hearing. (Tr. 60) Because Hood has raised no issue concerning the VE's opinions or regarding the ALJ's hypothetical questions to the VE, it is unnecessary to summarize all of the VE testimony. In relevant part, the ALJ asked the VE what jobs an individual who was able or unable to perform light work with the following limitations could do: frequently operate foot controls bilaterally; handle and finger frequently bilaterally; occasionally climb ramps and stairs; can never climb ladders, ropes, or scaffolds; can frequently balance; occasionally stoop, kneel, crouch and crawl; perform simple, routine or repetitive tasks but not at a pace, meaning no assembly line work; occasionally interact with supervisors, coworkers, and the public; and tolerate occasional routine workplace changes. (Tr. 60-61) The VE opined that an individual with the limitations described in the ALJ's hypothetical could work in a merchandise marker, housekeeping/cleaner, or food preparation role, such as a deli cutter/slicer. (Tr. 61)

## IV. Standard of Review and Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(a). Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work

experience, engage in any other kind of substantial gainful work which exists in the national economy3....

42 U.S.C. § 423(d)(2)(A).

In making a determination as to disability under this definition, an ALJ is required to follow the five-step sequential analysis set out in agency regulations, which can be paraphrased as follows:

1. If the claimant is doing substantial gainful activity, she is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before she can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's RFC and use it to determine if claimant's impairment prevents her from doing past relevant work. If claimant's impairment does not prevent her from doing his past relevant work, she is not disabled.

5. If claimant is unable to perform past relevant work, she is not disabled if, based on her vocational factors and RFC, she is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920; *Bowen v. Yuckert,* 482 U.S. 137, 140-142 (1987). Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to produce evidence that establishes whether the claimant has the RFC and vocational factors to perform work available in the national economy. *Id.*

This court's review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the correct legal standards were applied.

---

[3] "'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 423 (d)(2)(A).

*See Elam v. Comm'r of Soc. Sec.,* 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed

if the administrative law judge's findings and inferences are reasonably drawn from the record or

supported by substantial evidence, even if that evidence could support a contrary decision.");

*Kinsella v. Schweiker,* 708 F.2d 1058, 1059 (6th Cir. 1983). Substantial evidence has been

defined as "more than a scintilla of evidence but less than a preponderance; it is such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v.

Comm'r of Soc. Sec.,* 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and

Human Servs.,* 25 F.3d 284, 286 (6th Cir. 1994)).

 The Act provides that "the findings of the Commissioner of Social Security as to any fact,

if supported by substantial evidence, shall be conclusive." 42 U.S.C. §§ 405(g) and 1383(c)(3).

The findings of the Commissioner are not subject to reversal merely because there exists in the

record substantial evidence to support a different conclusion. *Buxton v. Halter,* 246 F.3d 762,

772-73 (6th Cir. 2001) (*citing Mullen v. Bowen,* 800 F.2d 535, 545 (6th Cir. 1986); *see also Her

v. Comm'r of Soc. Sec.,* 203 F.3d 288, 389-90 (6th Cir. 1999); *Key v. Callahan,* 109 F.3d 270,

273 (6th Cir. 1997). This is so because there is a "zone of choice" within which the

Commissioner can act, without the fear of court interference. *Mullen,* 800 F.2d at 545 (*citing

Baker v. Heckler,* 730 F.2d 1147, 1150 (8th Cir. 1984).

 The court must also determine whether proper legal standards were applied, because, if

not, reversal is required, unless the error of law was harmless. *See, e.g. White v. Comm'r of Soc.

Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 746 (6th

Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner

will not be upheld where the SSA fails to follow its own regulations and where that error

prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [when] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue,* 774 F.Supp.2d 875, 877 (N.D. Ohio 2011) (*quoting Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996); *accord Shrader v. Astrue,* No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue,* No. 1:10-cv-734, 2011 U.S. Dist. LEXIS 141342 (S.D. Ohio Nov. 15, 2011); *Gilliams v. Astrue,* No. 2:10-CV-017, 2010 U.S. Dist. LEXIS 72346 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-19822010, 2010 U.S. Dist. LEXIS 75321 (N.D. Ohio July 9, 2010).

## V.     The ALJ's Decision

The ALJ's August 25, 2016 decision contained the following findings relevant to this appeal:

1. Hood had not engaged in substantial gainful activity since July 31, 2014, the application date (20 C.F.R. 416.971 et seq.). (Tr. 12);

2. Hood had the following severe impairments: history of bilateral carpal tunnel syndrome, history of left renal/kidney cell carcinoma, degenerative disc disease of the lumbar spine, morbid obesity, and depression (20 C.F.R. 416.920(c)). (Tr. 12);

4. After careful consideration of the entire record, the ALJ found that the Hood had the residual functional capacity to perform a range of light work as defined in 20 C.F.R. 416.967(b). She was able to lift and carry 20 pounds occasionally, 10 pounds frequently; stand or walk for up to six hours; and sit for up to six hours of an eight-hour workday. She could frequently operate foot controls bilaterally. She could frequently handle and finger bilaterally. She could occasionally climb ramps and stairs; however, she can never climb ladders, ropes, or scaffolds. She could frequently balance and occasionally stoop, kneel, crouch, and crawl. She was limited to performing simple, routine, repetitive tasks at a non-production rate pace; she could not do assembly-line work. She could have occasional interactions with coworkers, supervisors, and the public. She could tolerate occasional routine workplace changes. (Tr. 14);

5. Hood had no past relevant work (20 C.F.R. 416.965). (Tr. 18);

9. Considering Hood's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that Hood could perform (20 C.F.R. 416.969 and 416.969(a)).  (Tr. 18)

Based on his ten findings, the ALJ determined Hood was not disabled through August 25, 2016, the date of the ALJ's decision.  (Tr. 19)

## VI.    Law & Analysis

### A.  The ALJ Did Not Err in Evaluating Dr. Konieczny's Medical Source Statement

Hood argues the ALJ did not properly consider consultative examiner, Dr. Konieczny's, medical opinion.  *See* ECF Doc. 17, Page ID# 1343.

An ALJ must determine how much weight to give to each medical opinion in the record. 20 C.F.R. §§ 404.1527(c), 416.927(c).  In making this determination, the ALJ should consider various factors, including (1) whether the medical source who provided the opinion has examined the claimant; (2) whether the source treated the claimant; (3) the amount of relevant evidence the source provided to support the opinion; (4) the extent to which the opinion is consistent with the record as a whole; (5) whether the source is a specialist; and (6) any other relevant factors, such as the source's knowledge of the Commissioner's disability programs and the extent to which the source is familiar with the claimant's history of treatment.  20 C.F.R. §§ 404.1527(c)(1)-(6); 416.927(c)(1)-(6).  Contrary to Hood's contention, the record supports the ALJ's decision to give only partial weight to Dr. Konieczny's opinion.

The ALJ gave partial weight Dr. Konieczny's opinion:

Because the claimant's depression is of recent origin and has not proven to be chronic or permanent, partial weight is given to the acute assessment of the consultative examiner who opined moderate to significant limitations in dealing with others in a vocational capacity (Exhibit 29F, p.4).  Partial, yet greater, weight is given to the opinion of the state agency reviewer opining the claimant can maintain concentration for simple tasks and thrive in a non-fast paced work environment (Exhibit 4A).  This is supported by factors such as the claimant's

17

ability to read, write, maintain back [*sic*] accounts, use a computer, and drive a car (Exhibit 6E; 12E; 43F, p. 48).

(Tr. 16)

Hood argues the ALJ's reasons for elevating the opinion of Dr. Katz above that of Dr. Konieczny were illogical. *See* ECF Docs. 17 and 19, Page ID# 1344, 1376. Hood's arguments lack merit. The ALJ gave state agency reviewer, Dr. Katz's, opinion "[p]artial, yet greater" weight because the ALJ found evidence supported Dr. Katz's opinion that Hood could "maintain concentration for simple tasks and thrive in a non-fast paced work environment," not because Dr. Katz issued her opinion three weeks after Dr. Konieczny issued his. (Tr.; 16) Hood also argues that her ability to complete solitary activities, like her ability to read, write, maintain bank accounts, use a computer, and drive a car, do not detract from Dr. Konieczny's opinion that she "is unable to respond to typical supervision and interpersonal situations in the work setting." *See* ECF Doc. 17, Page ID# 1345. The ALJ found those abilities supported Dr. Katz's opinion that Hood could maintain concentration for simple tasks and thrive in a non-fast paced work environment; the ALJ did not assert that Hood's ability to read, write, use a computer, etc. was relevant to whether she was able to respond to typical supervision or interpersonal situations in a work setting. (Tr. 16)

Hood argues that the medical evidence of record supports Dr. Konieczny's opinion that her "mental impairments are significant enough to preclude 'even simple pressure in a work setting.'" *See* ECF Doc. 17, Page ID# 1345 (citing Tr. 796). Hood's characterization of Dr. Konieczny's opinion is inaccurate. (Tr. 796) Dr. Konieczny opined that because of her significant depression, Hood "would have significantly diminished tolerance for frustration and diminished coping skills which *would impact her ability to respond to* an even simple pressure situation in the work setting." (*Id.*) (emphasis added)

18

The commissioner argues Hood has failed to show how the ALJ's evaluation of Dr. Konieczny's opinion has harmed her, because the ALJ's RFC was not inconsistent with Dr. Konieczny's assessments. *See* ECF Doc. 18, Page ID# 1368. The commissioner argues "the ALJ included some measure of restriction in each of the areas generally identified as problematic by Dr. Konieczny." *Id.* Dr. Konieczny opined that Hood would have significantly diminished tolerance for frustration and diminished coping skills which would impact her ability to respond to typical supervision and interpersonal situations in the work setting. (Tr. 796) The ALJ noted:

> [t]he evidence in the record, including the testimony of the claimant at the hearing, shows that she is able to interact appropriately and effectively with other individuals on a sustained basis. For example, she is generally regarded as pleasant and cooperative; she spends time with family and friends and she gets along well with others such as neighbors and authority personnel (Exhibit 6E; 12E; 18F, p. 10; 43F, p. 48).

(Tr. 13) The ALJ limited Hood to only occasional interaction with coworkers, supervisors, and the public (Tr. 14) Hood has failed to explain how or provide evidence showing that this limitation in the RFC failed to account for her limitations.

Dr. Konieczny opined that Hood would have significantly diminished tolerance for frustration and diminished coping skills which would impact her ability to respond to even simple pressure situation in the work setting. (Tr. 796) The commissioner argues the ALJ accommodated Dr. Konieczny's opinion by limiting Hood to work not requiring production-rate pace, assembly-line work, or more than occasional changes in the workplace routine. *See* ECF Doc. 18, Page ID# 1369 (citing Tr. 14). Hood counters that "[t]he ALJ's finding that [] Hood's depression is such that her ability to respond to even simple pressures is limited." See ECF Doc. 19, Page ID# 1377 (citing Tr. 796). Hood's argument has some merit because having to do any work, even if not on an assembly-line or at a production rate pace, would likely involve at least some "simple pressure." However, even if the ALJ's RFC did not fully account for Dr.

19

Konieczny's opinion regarding Hood's ability to handle "an even simple pressure situation in the work setting," the court nevertheless finds that substantial evidence supports the ALJ's weighing of Dr. Konieczny's opinions for the reasons that follow.

The ALJ found Hood's depression was of recent origin, had not been proven to be chronic or permanent, and was "situational in nature and [] not indicative of her underlying baseline level of capability." (Tr. 16) The ALJ noted that the evidence showed Hood's "depression was brought on by her recent health concerns and tragedies in her family." (Tr. 15) Indeed, Hood tended to report symptoms of depression, suicidal ideation, and/or anxiety only in certain situations or after certain events occurred, such as after a family member died (Tr. 633-34, 692, 1035), after she was denied social security benefits (Tr. 825, 833, 888, 958, 988), when she learned that she or a family member had or might have a serious medical condition (Tr. 633-34, 816, 1031), or before a medical procedure or surgery. (Tr. 1035, 1092, 1094)

Although "[a] person's personal problems and his or her mental disorders cannot always be [] neatly disentangled," Hood has not argued that the ALJ erred in finding that her depression was situational in nature. *See White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 284 (6th Cir. 2009). Rather, the evidence indicates that Hood and/or her medical providers sometimes attributed her depression or anxiety symptoms to particular situational factors. (Tr. 816 (Hood reported feeling down, anxiety, and nervousness due to investigations regarding any relapse of her kidney cancer), 888 (Dr. Diwgosh noted Hood seemed despondent over being rejected for disability benefits); 958 (Dr. Keaton noted Hood had situational anxiety);1035 (Hood reported that her depression was secondary to her father-in-law having passed away and her anxiety was secondary to her planned epidural injection))

Hood often did not report symptoms of depression or anxiety to her service providers,

and her mental status examinations were often normal.  (Tr. 627-28, 676, 687, 689, 671, 741, 904, 951, 1109, 1161, 177, 1187, 1200-01, 1208, 1213, 1222, 1242-43)  The ALJ noted there was a general lack of treatment and/or counseling relating to Hood's reported depression and crying spells.  (Tr. 15)  Although Dr. Konieczny noted Hood was "quite tearful and occasionally labile throughout the evaluation" (Tr. 794-96), other medical services providers noted that Hood was tearful or had reported crying episodes only a few times, and only after she learned of a health condition, a tragedy in her family, or a denial of disability benefits.  (Tr. 692-93, 825, 1031, 1035)  The ALJ found that the medical management she had pursued for her symptoms did not clinically verify or substantiate the disabling limitations Hood alleged.  (Tr. 15)  Hood also reported medication improved her mental condition.  (Tr. 819, 1037)

The opinion of state agency reviewing psychologist, Dr. Katz, also provides support for the ALJ's RFC determination.  State agency medical and psychological consultants are "highly qualified physicians, psychologists, and other medical specialists who are also experts in Social Security disability evaluation." 20 C.F.R. § 404.1527.  Dr. Katz opined Hood was able to "interact on an occasional, superficial basis," was only moderately limited in her ability to accept instructions and respond appropriately to criticism from supervisors, and was not significantly limited in her ability to interact appropriately with the general public or get along with coworkers or peers.  (Tr. 90)  Dr. Katz also opined Hood was only moderately limited in her abilities to respond appropriately to changes in the work setting, carry out detailed instructions, and maintain attention and concentration for extended periods.  (Tr. 89-90)  She opined Hood was not significantly limited in her other abilities involving adaptation or sustained concentration and persistence.  *Id.*

Hood argues that her GAF scores support Dr. Konieczny's opinions.  Social worker

Terese Cybulski assigned Hood a GAF rating of 41 on May 14, 2015. (Tr. 835) Dr. Keaton assigned Hood a GAF score of 30 on May 21, 2015, during Hood's inpatient treatment at Astabula County Medical Center. (Tr. 959) Dr. Patwa assigned Hood GAF scores of 45-50 during the period from June 22 to September 18, 2015. (Tr. 820, 822) Although Hood continued to see Dr. Patwa, Dr. Patwa did not assign additional GAF scores. (Tr. 1031-37) The ALJ did not discuss these GAF scores.

"A GAF score is a 'subjective rating of an individual's overall psychological functioning,' which may assist an ALJ in assessing a claimant's mental RFC." *Miller v. Comm'r of Soc. Sec.*, 811 F.3d 825, 835–36 (6th Cir. 2016) (quoting *Kennedy v. Astrue*, 247 F. App'x 761, 766 (6th Cir.2007). "GAF scores are not raw medical data, and the Commissioner has declined to endorse the GAF score for use in Social Security benefits programs." *Id.* at 836 (internal quotation marks and citations omitted); *Kennedy*, 247 F. App'x at 766. "A GAF score is [] not dispositive of anything in and of itself, but rather only significant to the extent that it elucidates an individual's underlying mental issues." *Oliver v. Comm'r of Soc. Sec.*, 415 F. App'x 681, 684 (6th Cir. 2011).

Hood does not argue the ALJ erred by failing to address these GAF scores. Rather, Hood argues the GAF scores support Dr. Konieczny's medical opinions. *See* ECF Doc. 17, Page ID# 1345-46. The court finds that Hood's low GAF scores fail to show that the ALJ's decision lacked substantial evidentiary support. As the Sixth Circuit explained in *Kornecky*, "according to the DSM's explanation of the GAF scale, a score may have little or no bearing on the subject's social and occupational functioning." *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 511 (6th Cir. 2006). As in *Kornecky*, Hood's medical providers, Ms. Cybulski, Dr. Keaton, and Dr. Patwa did not accompany their relatively low GAF scores with any suggestion that Hood was

unable to do work. *See Kornecky*, 167 F. App'x at 511. Rather, as the ALJ noted, Hood was "generally found to be alert and cooperative with and [*sic*] appropriate affect, normal speech patterns, linear and goal-directed thoughts, normal comprehension, an intact memory, and to have fair insight and judgment" and often had generally unremarkable mental status examinations (Tr. 15 (citing 594, 795, 816, 822), 579, 627-28, 671-72, 676, 687, 689, 741, 753-54, 819, 873, 879, 884, 904, 951, 1031, 1033, 1035, 1037, 1109, 1177, 1187, 1213). The VE also testified that someone with Hood's RFC could still do certain widely available work. *C.f. Kornecky*, 167 F. App'x at 511.

The court finds substantial evidence supported the ALJ's decision to give Dr. Konieczny's opinion partial weight.

## VII.    Conclusion

Because the ALJ properly evaluated the opinion of the state agency examining consultant, Hood has not demonstrated a basis upon which to reverse or remand the commissioner's decision. The commissioner's decision was supported by substantial evidence and is AFFIRMED.

IT IS SO ORDERED.

Dated: July 5, 2018

Thomas M. Parker
United States Magistrate Judge

23